**Virgil McCORMACK, Respondent,**

v.

**CARMEN SCHELL CONSTRUCTION COMPANY, Appellant/Employer,**

and

**ITT Hartford Insurance Company, Appellant/Insurer.**

**No. WD 60771.**

Missouri Court of Appeals, Western District.

June 25, 2002.

Thomas R. Hill, Geoff Clark, Kansas City, for Appellant.

Richard P. Scaletty, Independence, for Respondent.

Before ELLIS, P.J., and EDWIN H. SMITH and HOWARD, JJ.

VICTOR C. HOWARD, Judge.

Employer Carmen Schell Construction Company (Schell)[1] appeals from the decision of the Labor and Industrial Relations Commission (the Commission) awarding workers' compensation benefits to its employee Virgil McCormack for injuries caused by an electrical shock.

Schell brings four points on appeal. First, it alleges that the Commission erred in finding that Mr. McCormack's complaints and symptoms are physiologically related to electrical shock. Second, Schell alleges that the Commission erred in awarding additional medical expenses to Mr. McCormack relating to treatment of his mental condition at Charter Hospital, because Mr. McCormack failed to prove his mental condition was directly and proximately caused by the electrical shock accident. Third, Schell alleges that the Commission erred in awarding costs to Mr. McCormack pursuant to sections 287.140.5 and 287.560 RSMo 2000.[2] Schell maintains that Mr. McCormack unreasonably refused to submit to treatment at the Mayo Clinic, so Schell's termination of Mr. McCormack's benefits and defense of the claim when Mr. McCormack did not go to the Mayo Clinic was not unreasonable. Fourth, Schell alleges that the Commission erred in finding Mr. McCormack was permanently and totally disabled as a result of the injuries he sustained in the electrical shock accident.

We affirm.

## Background

In March 1995, Schell hired Virgil McCormack to perform layout work and framing at the Marion Merrill Dow project

---

1. Schell's workers' compensation insurance carrier, ITT Hartford, also jointly appeals from the Commission's award. For the sake of simplicity, we will refer to Schell and ITT as "Schell" with the understanding that ITT makes the same arguments.

2. Statutory references are to RSMo 2000.

in Kansas City, Missouri. On December 13, 1995, Mr. McCormack was standing on a scaffolding approximately six feet above the floor with his chest and arms against a metal sprinkler pipe as he took measurements to install sheetrock when his elbow came in contact with a live, uninsulated electrical wire. After being shocked, Mr. McCormack collapsed to the floor of the scaffold, and his co-workers sought medical attention. After a one-night stay in the hospital for observation and a few days spent at home for recovery, Mr. McCormack attempted to return to work, where he experienced numbness and tingling in his arms and problems with pain and dizziness. He was unable to continue working as a result.

Over the next several years, Mr. McCormack received extensive medical treatment for his injuries sustained in the electrical shock incident. Various doctors diagnosed his injuries to include a seizure disorder, cognitive dysfunction, organic mood disorder, depression, anxiety, and post-traumatic stress disorder. Mr. McCormack received extensive workers' compensation benefits and vocational services for his injuries until Schell discontinued his benefits on April 1, 1999, after Mr. McCormack was unable to attend an appointment at the Mayo Clinic in Minnesota that had been arranged by Schell.

A final hearing was held before Administrative Law Judge (ALJ) Emily Fowler from October 2 through October 5, 2000. Both sides offered extensive testimony, both lay and medical, in addition to extensive supporting documentation.[3] On January 11, 2001, Judge Fowler issued her findings of fact and rulings of law, in which she found Mr. McCormack to be permanently and totally disabled as a result of his injuries sustained in the electrical shock incident. Judge Fowler's findings include extensive details of Mr. McCormack's medical treatment and summaries of the testimony offered at the hearing in support of her award, which we discuss in more detail where necessary in our consideration of Schell's points on appeal. In addition to finding Mr. McCormack permanently and totally disabled, Judge Fowler found that Mr. McCormack's treatment for his mental and physiological symptoms was causally related to his electric shock injury sustained while working for Schell on December 13, 1995. Judge Fowler also found Schell's discontinuation of Mr. McCormack's benefits on April 1, 1999, to be "wholly unreasonable" under section 287.140.5, and awarded "costs" pursuant to section 287.560.[4] She also ordered that Schell pay Mr. McCormack temporary total disability benefits for the period of April 1, 1999, to October 6, 2000, which is when his permanent total disability benefits began. Judge Fowler further ordered Schell to pay $39,977.67 in medical bills already incurred by Mr. McCormack and not covered by Schell, in addition to an order that it pay his future medical costs. She also awarded Mr. McCormack's counsel a twenty-five percent attorney's fee.

On January 30, 2001, Schell applied for a review of the ALJ's findings and award before the Commission. In its application, Schell alleged the ALJ's award was erroneous: (1) in finding Mr. McCormack to be permanently and totally disabled, (2) in finding that Mr. McCormack did not violate section 287.140.5 in refusing to go to

3. The record on appeal contains twenty-five volumes of transcripts, medical records, and other documentary evidence consisting of more than 6,350 pages submitted to the Commission.

4. These statutes are discussed more fully in Point III.

the Mayo Clinic, (3) in finding that its defense of the claim was unreasonable and awarding costs under section 287.560, (4) in finding Mr. McCormack's psychiatric treatment at Charter Hospital beginning July 15, 1999, to be causally related to his injury of December 13, 1995, and (5) in finding that none of the treating physicians determined Mr. McCormack was malingering or faking. On March 14, 2001, in response to Mr. McCormack's answer to Schell's application for review, the Commission designated the case as a hardship, thereby allowing for an accelerated briefing schedule upon receipt of the transcript.

On October 30, 2001, the Commission entered its "Final Order Allowing Compensation." A majority of the Commission[5] found the ALJ's award was supported by competent and substantial evidence and was made in accordance with Chapter 287.[6] The Commission affirmed and incorporated in its order the ALJ's award, except as modified concerning the costs award under section 287.560 for Schell's unreasonable denial of benefits. The Commission noted that the modification was necessary because the ALJ had not specified the amount or nature of the ordered "costs," so the Commission felt compelled, "in view of the admonitions in *Stillwell* [*v. Universal Construction Co.*, 922 S.W.2d 448 (Mo.App. W.D.1996)]," to address the issue. The Commission also agreed that Mr. McCormack's failure to go to the Mayo Clinic for treatment was not unreasonable. The Commission further agreed with the ALJ

that costs should be assessed against Schell and its insurer, ITT Hartford. However, the Commission found that Schell was not unreasonable in its defense of *all* issues and took that into account in its award of costs for Schell's unreasonable discontinuation of Mr. McCormack's temporary total benefits. The Commission determined that, "in weighing the nature of the offensive behavior, and the expenses incurred," the appropriate costs to be assessed against Schell and ITT Hartford, under section 287.560, which costs had not been delineated by the ALJ, would be limited to the costs of the deposition fees of the medical experts, or $5,162.50. The Commission also approved and affirmed the attorney's fee award.

This appeal follows.

## Standard of Review

■ Section 287.495.1 governs our review of the Commission's award in Mr. McCormack's favor; it states in relevant part:

Upon appeal no additional evidence shall be heard and, in the absence of fraud, the findings of fact made by the commission within its powers shall be conclusive and binding. The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:

---

5. Commissioner Christian Wrigley filed a dissenting opinion in which he stated that after reviewing all of the evidence, "[he did] not find [McCormack] to be permanently and totally disabled on account of this injury; nor did [he] find the additional medical expenses or costs to have been appropriately awarded," so he would reverse the ALJ's decision as to permanent total disability and costs against

the employer. As discussed repeatedly herein, Schell relies heavily upon this dissent in arguing that the Commission's award is against the weight of the evidence.

6. Chapter 287 of the Missouri Revised Statutes is Missouri's "Workers' Compensation Law."

(1) That the commission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts found by the commission do not support the award;

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

*Thorsen v. Sachs Elec. Co.*, 52 S.W.3d 611, 617 (Mo.App. W.D.2001); Mo. Const. art. V, § 18. Although an employee bears the burden of proving the elements of his claim to a "reasonable probability," it is well-settled that "[t]he Workers' Compensation Law should be interpreted in a liberal manner in favor of the employee. Questions regarding the right of the employee to benefits must be resolved in the injured employee's favor." *Avery v. City of Columbia*, 966 S.W.2d 315, 320 (Mo.App. W.D.1998) (citations omitted).

■ Generally, we review the findings of the Commission rather than those of the ALJ. *Tangblade v. Lear Corp.*, 58 S.W.3d 662, 665 (Mo.App. W.D.2001). However, when the Commission affirms or adopts the findings of the ALJ, as it has here except for its modification of the ALJ's award of costs, our review is of the decision and findings of the ALJ as adopted by the Commission. *Id.* We borrow from *Davis v. Research Medical Center*, 903 S.W.2d 557, 571 (Mo.App. W.D.1995) (en banc) in explaining our standard of review:

The court applies a two-step process designed to determine whether the Commission could have reasonably made its findings and award upon consideration of all the evidence before it. In the first step, the court examines the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine if the record contains sufficient competent and substan-tial evidence to support the award. If not, the Commission's award must be reversed. If there is competent and substantial evidence supporting the award, the court moves to the second step, where it views the evidence in the light most favorable to the award, but must consider all evidence in the record, including that which opposes or is unfavorable to the award, take account of the overall effect of all of the evidence, and determine whether the award is against the overwhelming weight of the evidence. In doing so, it takes into consideration the credibility determinations of the Commission and, if those determinations as to witnesses who gave live testimony before the ALJ are different than those made by the ALJ, it also considers the ALJ's credibility findings as well as the reasons, if any are given, why the Commission differed with those findings. Findings and awards of the Commission which are clearly the interpretation or application of the law, as distinguished from a determination of facts, are not binding on the court and fall within the court's province of independent review and correction where erroneous. And, where the findings of ultimate fact are reached not by a process of natural reasoning from the facts alone, but rather by application of law, it is a conclusion of law and subject to reversal by the court.

■ In this case, Schell conceded at oral argument that the Commission's award is supported by competent and substantial evidence but argues that the award is nonetheless against the weight of the evidence. Thus, the focus of our analysis will be on the second step of the standard of review set forth in *Davis* to determine whether the award is against the weight of the evidence. *Id.* "When courts speak of the 'weight of the evidence,' they mean its weight in probative

value, not the quantity or amount thereof." *Chatmon v. St. Charles County Ambulance Dist.*, 55 S.W.3d 451, 455 (Mo.App. E.D.2001). As set forth above in discussing *Davis*, we consider *all* evidence in the record, regardless of whether it does not favor the award, in order to determine if the findings and award must be reversed as clearly contrary to the overwhelming weight of the evidence. *Davis*, 903 S.W.2d at 571. Nonetheless, in considering the effect of all the evidence in the record, we view it in a light most favorable to the Commission's decision. *Id.* With regard to credibility issues, this court "may not substitute its judgment on the evidence for that of the Commission. The weight of the evidence and the credibility of witnesses are ultimately for the Commission." *Id.* In this case, except for a modification of the ALJ's award of costs under section 287.560, the Commission adopted the findings and award of the ALJ. This "resulting consistency, especially as concerns credibility determinations, is a powerful factor in favor of upholding the Commission's award on appeal." *Id.*

**Point I: Physiological Causation**

■ In Schell's first point on appeal, it alleges that the Commission "erred in finding physiological causation for [Mr. McCormack]'s complaints and symptoms because [sections] 287.020.32[sic] and [] 287.020.3 mandate that [Mr. McCormack] establish that work was a substantial factor with regard to causation." Specifically, Schell argues that "the competent medical evidence failed to establish that the problems of which [Mr. McCormack] complains are related physiologically to electrical shock."

Section 287.020 sets forth the following relevant portions of the statutory definitions relied upon by Schell in its arguments:

2. The word **"accident"** as used in this chapter shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen identifiable event or series of events happening suddenly and violently, with or without human fault, and producing at the time objective symptoms of an injury. *An injury is compensable if it is clearly work related. An injury is clearly work related if work was a substantial factor in the cause of the resulting medical condition or disability. An injury is not compensable merely because work was a triggering or precipitating factor.*

3. (1) In this chapter the term **"injury"** is hereby defined to be an injury which has arisen out of and in the course of employment. The injury must be incidental to and not independent of the relation of employer and employee. Ordinary, gradual deterioration or progressive degeneration of the body caused by aging shall not be compensable, except where the deterioration or degeneration follows as an incident of employment.

(2) An injury shall be deemed to arise out of and in the course of the employment only if:

(a) *It is reasonably apparent, upon consideration of all the circumstances, that the employment is a substantial factor in causing the injury;* and

(b) It can be seen to have followed as a natural incident of the work; and

(c) *It can be fairly traced to the employment as a proximate cause;* and

(d) It does not come from a hazard or risk unrelated to the employment to which workers would have been equally exposed outside of and unrelated to the employment in normal nonemployment life[.]

\* \* \*

(Italicized emphasis added.)

In support of its argument that the Commission's findings that Mr. McCormack's complaints are physiologically[7] related to the electrical shock incident are against the weight of the evidence, Schell relies heavily upon Commissioner Wrigley's dissenting opinion. Commissioner Wrigley offered the following brief, conclusory reasoning for his dissent from the majority's finding in favor of Mr. McCormack:

> The competent medical evidence fails to establish that the problems of which the employee now complains is related physiologically to electrical shock. The medical testing reflects no diagnosis of disease or injury to his chest or leg. The findings of Dr. Abrams, as to cognitive deficit, are based upon the employee's subjective statement. The other medical evidence finds no cognitive problems or suggests that the employee may be malingering. While I do not doubt that the employee has sustained some injury and disability as a result of this event, I believe the preponderance, if not the overwhelming weight of the evidence, demonstrates that the employee is not permanently and totally disabled as a result of that injury.

Schell cites *Davis* in support of its argument that this dissenting opinion "should be considered as presumptively probative or as a great aid to the reviewing Court." Specifically, Schell argues that *Davis,* 903 S.W.2d at 571, discusses that the dissent's determination of "the evidentiary issues of competent medical evidence, preponderance of the evidence, and overwhelming weight of the evidence ... should be a

'great aid' to the reviewing court." However, Schell cites *Davis* out of context. *Davis* says nothing about a dissenting Commissioner's opinion except to note that there was one. Schell's argument that the dissent's articulated reasoning for its determinations contrary to those of the ALJ are probative misconstrues *Davis.* In *Davis,* this court was asked to review an award by the Commission that had reversed the findings and award by the ALJ. 903 S.W.2d at 570. In discussing the second step of the standard of review described above, *Davis* points out that:

> *when the Commission's determinations as to the credibility of witnesses who gave live testimony before the ALJ are different from those made by the ALJ,* the ALJ's contrary findings must be given due consideration, bearing in mind that evidence supporting a conclusion may be less substantial when an impartial, experienced ALJ who has observed the witnesses and lived with the case has drawn conclusions different from the Commission's. *In such cases,* it is therefore a great aid to the reviewing court if the Commission articulates the reasons why it differed in its credibility determinations. Otherwise, this court is left to search the record and speculate as to the Commission's rationale.

*Id.* at 570–71 (emphasis added). The case now before us is not "such a case." Here, unlike in *Davis,* the majority of the Commission adopted the ALJ's detailed, fourteen-page opinion awarding Mr. McCormack permanent and total disability benefits, with only a minor modification regarding the ALJ's award of costs. As explained above in our discussion of the standard of review, "the resulting consis-

---

7. "Physiological" is defined as "being in accord with or characteristic of the normal functioning of a living organism." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed.2000), *available at* http://www.dictionary.com/search?q=physiological.

tency [between the ALJ's and the Commission's determinations], especially as concerns credibility determinations, is a powerful factor in favor of upholding the Commission's award on appeal." *Id.* at 571.

We, therefore, turn to our review of the entire record to determine whether the Commission's award is against the weight of the evidence. First, we note that the record on appeal consists of more than 6,350 pages of testimonial and documentary evidence related to Mr. McCormack's accident and his subsequent, substantial medical treatment. Schell isolates small portions of the medical evidence in support of its argument that the award is against the weight of the evidence while seemingly disregarding the large amount of medical testimony and evidence to the contrary. Schell appears to have overlooked the deference we grant the majority of the Commission with regard to its credibility findings when conflicting medical theories as to causation are presented, *Tangblade*, 58 S.W.3d at 668, while also overlooking the fact that although we consider all evidence in the second step of our review, the evidence is nonetheless viewed in a light most favorable to the Commission's award. *Davis*, 903 S.W.2d at 571.

Schell's arguments primarily rely upon the fact that several of the objective neurological tests performed on Mr. McCormack produced "normal" results. For example, Schell points to the fact that Dr. Bernard Abrams, a neurologist who first saw Mr. McCormack in October of 1998 and who diagnosed Mr. McCormack's brain injury "manifested by seizure disorder and cognitive difficulties," conducted three EEG [8] examinations of Mr. McCormack's brain wave function. All three EEG's produced "normal" results. While this may indeed be the case, Schell fails to acknowledge that further review of Dr. Abrams' testimony reveals that Dr. Abrams subsequently explained that it is not unusual for patients suffering from seizures to have normal neurological examinations. In fact, Dr. Abrams testified that forty percent of the time seizure patients have normal EEGs. Dr. Abrams also explained that it is not unusual for there to be a lag time between the date of initial injury and development of seizures. In Dr. Abrams' opinion, to a reasonable degree of medical certainty, Mr. McCormack's seizure disorder and cognitive dysfunction were caused by the electric shock injury of December 13, 1995. Dr. Abrams also testified that as a result of the shock, Mr. McCormack suffers from a wide range of work-related limitations, such as the inability to work at heights or around equipment that would endanger him if he lost consciousness, a "very poor" ability to learn and retain job tasks, emotional instability causing the inability to get along well with others, and musculoskeletal pain. Schell's focus upon only "normal" test results does not discredit this testimony.

Schell also argues that the testimony of Dr. Gordon Kelley, a neurologist who first examined Mr. McCormack on January 10, 1996, less than a month after the accident, supports its argument that Mr. McCormack's complaints were not physiologically related to electrical shock. Schell points out that Dr. Kelley performed a nerve conduction study and an EMG on Mr. McCormack. Dr. Kelley determined that Mr. McCormack had not sustained any electrical burns from the incident and the only abnormal finding of the tests was carpal tunnel syndrome. Dr. Kelley ad-

---

**8.** An EEG, or electroencephalogram, is defined in relevant part as "[a] graphic record of the electrical activity of the brain." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, *available at* http://www. dictionary.com/search?q=electroencephalogram.

mittedly made such determination prior to obtaining Mr. McCormack's complete medical history, which showed in his hospital records that he did suffer a small electrical burn near his right elbow. Schell also cites to Dr. Kelley's re-evaluation of Mr. McCormack's chest and shoulder discomfort on February 23, 1996. As emphasized by Schell, Dr. Kelley determined that "the relationship [of his chest pain] to the electrical shock [was] unclear," and "the pattern of his symptoms and his basically normal bedside exam made [Dr. Kelley] think it was very unlikely it was a disease of the brain, spinal cord, or peripheral nerves or muscles." Schell again apparently disregards the fact, as noted in the findings of the Commission, that "[o]n cross-examination, Dr. Kelley admitted that an electrical shock to [Mr. McCormack's] right arm could cause the carpal tunnel and, further, that [Mr. McCormack's] chest and shoulder pain also could be due to the electric shock injury." This evidence supports the Commission's finding of causation and the contrary evidence is not of greater weight.

Schell also focuses upon "normal" results of other diagnostic testing such as an MRI of the brain, a 24–hour EEG monitoring study, and a SPECT scan, as well as testimony of other doctors who offered opinions contrary to the Commission's award. In each case, there was testimony that the normal results did not conclusively indicate a lack of injury from the electrical shock. For example, Schell argues that Dr. Sam Mehr's finding that a PET scan performed on Mr. McCormack showed that he had abnormal brain function from an electrical injury was discredited by Dr. Helen Mayberg's testimony that she could not determine, based on her

experience and training in PET scans, whether or not Mr. McCormack sustained an injury to his brain as a result of an electrical injury. In fact, Dr. Mayberg stated that she "[could] not draw any conclusions. No matter what the PET scan show[ed]." As noted by the ALJ, although Dr. Mayberg agreed that the PET scan did not look normal, "she had no opinion as to whether or not [Mr. McCormack had] a seizure disorder." Dr. Mayberg's testimony does not successfully discredit Dr. Mehr's, which the ALJ and Commission found credible. Even if it did, issues of conflicting medical theories as to causation are for the Commission to decide. *Tangblade*, 58 S.W.3d at 668.

Schell also attempts to attack the credibility of the doctors who diagnosed Mr. McCormack's psychological problems, such as anxiety and depression, which the doctors opined were a result of the electrical shock. Schell believes that "the claimant's alleged depression and other psychological issues do not fall within the definition of [section] 287.020.2 or [section] 287.020.3." In support of its argument, Schell relies on reasoning from a case previously handed down by this court. However, the Missouri Supreme Court subsequently took that case. The supreme court then issued an opinion,[9] which supercedes this court's prior opinion. Mo. Const. art. V, § 10. The supreme court's opinion does not include the reasoning based upon the "four shorthand tests" discussed in this court's superceded opinion and upon which Schell heavily relies. Thus, we disregard that portion of Schell's argument.

The majority of the evidence provided by Schell was contradicted by the testimony of several of Mr. McCormack's treating doctors as well as lay witnesses who were

---

**9.** The supreme court's opinion is reported as *Wells v. Brown*, 33 S.W.3d 190 (Mo. banc 2000).

able to provide a background of Mr. McCormack's physiological condition prior to the electrical shock. For example, Dr. Joyce Tobiasen, Dr. Marvin Steiner, Dr. Sam Mehr, Dr. Mahmoud Wahba, and Dr. Johnson also testified to a reasonable degree of medical certainty that Mr. McCormack suffers from seizures, cognitive dysfunction, myofascial pain, organic mood disorder, depression and post-traumatic stress disorder and varying other physiological and psychological issues as a result of his electrical shock injury. Mr. McCormack's friends and family also testified concerning his condition both before and after the accident. Schell attempts to discredit, or show as "legally insufficient," the doctors' testimony in support of the Commission's findings concerning the relation between Mr. McCormack's complaints and the electrical shock by isolating excerpts from testimony throughout the record and maintaining that the complaints do not fall within the definition of sections 287.020.2 or 287.020.3. We do not find it necessary to individually address all of the conflicting medical opinions presented in this case. The ALJ's findings, as adopted by the Commission, concerning causation of Mr. McCormack's physiological and psychological injuries and disabilities adequately address the matter and are not against the weight of the evidence.

Point I is denied.

## Point II: Hospitalization at Charter—Causation

■ Schell's second point on appeal challenges the Commission's award to Mr. McCormack of additional medical expenses for his hospitalization at Charter Hospital. Schell alleges that an unfavorable civil jury verdict not the electrical shock led to his Charter hospitalization and the attendant medical costs.

■ Missouri's Workers' Compensation Law compensates a worker for a mental condition if it is shown to have been directly and proximately caused by the accident. *Chatmon,* 55 S.W.3d at 456. Schell maintains that Mr. McCormack failed to meet his burden of proof in showing that the mental condition for which he received treatment at Charter Hospital was directly and proximately caused by the electrical shock accident rather than by the results of his civil trial.

On June 14, 1999, Mr. McCormack arrived for an appointment at Dr. Abrams' office in what Dr. Abrams described as a "highly agitated and disturbed" condition. Dr. Abrams testified with regard to this visit as follows:

> [H]e told me that he was tired of feeling bad. He didn't have any strength left; his nightmares were getting worse; he got really confused; and he had very violent dreams, which he couldn't get rid of. And at that point he states he had thoughts about killing himself. And sometimes he didn't have the strength to go on living. He felt like a prisoner in his own house. And he felt like he was being watched a[nd] followed. He considered shooting himself with a shotgun.

In response, Dr. Abrams, after consulting Dr. Joyce Tobiasen, Mr. McCormack's psychologist, and with the consent of Mr. McCormack's wife, arranged for Mr. McCormack's immediate hospitalization at Charter Hospital for psychiatric therapy.

The ALJ's findings, as adopted by the Commission, concerning Mr. McCormack's treatment at Charter are as follows:

> The hospitalization at Charter Hospital is causally related to Claimant's electrical shock injury. [Schell] argued that this medical care was necessitated by the stress from [Mr. McCormack]'s civil case. It was apparent that [Mr. McCormack]'s civil case was a stressor in his

life but it is equally apparent that it was not the sole cause of his breakdown. The underlying component of his breakdown, which necessitated his hospitalization at Charter, was the combination of his post-traumatic stress disorder, coupled with his depression. These illnesses were the direct result of his electric shock injury as determined by his treating physicians.

We first note that a large portion of Schell's argument appears to be directed toward the causation of Mr. McCormack's mental condition and physiological symptoms overall, which are discussed in Point I. The Commission's findings that Mr. McCormack's mental condition was caused by the electrical shock is not against the weight of the evidence. Schell's second point on appeal actually focuses on Mr. McCormack's hospitalization at Charter Hospital, so we limit our discussion to that issue.

Schell again insists that Commissioner Wrigley's dissenting opinion be adopted on the issue of additional medical costs for the Charter hospitalization. In support of its argument that the Commission's findings are against the weight of the evidence because Mr. McCormack's mental condition resulted from his civil trial, Schell again isolates small portions of the record. For example, Schell cites to parts of the testimony of Dr. Chris D. Fevurly, who evaluated Mr. McCormack for the second time on May 31, 2000. Dr. Fevurly opined that there was no causal relationship between Mr. McCormack's "symptom complex" and the electrical shock. Schell calls attention to Dr. Fevurly's notation in his report to the employer that he "[did] **not**

**expect to see further recovery until the legal issues [were] settled in a final and unappealable fashion.**" (Emphasis in original.) Schell also points to the fact that Dr. Fevurly stated that "there [were] **no objective factors to support the need for permanent limitations** outside the neuropsychiatric issues of depression, anxiety, and his maladaptive pain behavior." (Emphasis in original.) Schell also cites to portions of the testimony of Dr. Patrick Hughes, a psychiatrist who opined that Mr. McCormack's symptoms "are simply *Malingering.*" (Emphasis in original.) Schell notes that Dr. Hughes' report states that "the cause of [Mr. McCormack's] then-psychiatric distress that necessitated the hospital stay was simply and exclusively his fury and dismay about his adverse jury verdict." Dr. Hughes explicitly disagreed with Dr. Wahba, Mr. McCormack's treating psychiatrist at Charter's opinion to the contrary. Schell highlights the fact that the "nursing assessment," taken when Mr. McCormack first entered Charter, notes that when asked if he "had people mad at [him] a lot," Mr. McCormack replied, "just got out of a big ugly trial." It also notes that Charter records indicate Mr. McCormack had at some time reportedly considered assaulting a neurologist for the defense.

▮ Schell's remaining contentions about the evidence in support of its argument concerning Mr. McCormack's hospitalization at Charter lack any citation to the twenty-five-volume record on appeal. For example, Schell details Mr. McCormack's civil trial and its results without providing any citation in the record to verify its statements.[10] Rule

---

10. In support of its argument, Schell refers to the trial transcript in another appeal that was previously before this court by citing its docket number and a trial transcript page number. However, Schell made no motion to transfer the transcript from that case and incorporate it into this appeal. Moreover, that transcript does not appear to have been before the Commission. We will not consider evidence that was not presented to the Commission. *See*

84.04(i) [11] dictates that "[a]ll statements of fact and argument shall have specific page references to the legal file or the transcript." As explained by the Eastern District, "[t]he requirements of Rule 84.04 are not only mandatory but also essential for the effective functioning of appellate courts." *Draper v. Aronowitz*, 695 S.W.2d 923, 924 (Mo.App. E.D.1985). A party's mandated compliance with this Rule allows this court to verify the evidence upon which a party relies in support of its argument; without such compliance, this court would effectively act as an advocate of the non-complying party, which we cannot do. This court cannot assume Schell's statements to be true and cannot spend time "perus[ing] the [6,350 page-plus] record to determine if the statements are factually supportable." *Lewis v. FAG Bearings Corp.*, 5 S.W.3d 579, 588 (Mo.App. S.D. 1999).

Schell also relies on *Tibbs v. Rowe Furniture Corp.*, 691 S.W.2d 410 (Mo.App. S.D.1985), in support of its contention that the Commission's finding on causation concerning his treatment at Charter is against the weight of the evidence. Specifically, Schell emphasizes that in *Tibbs* the ALJ found claimant's mental condition was not compensable because it was the result of an "unsettled domestic dispute, unfortunate social relationships, and financial difficulties." *Id.* at 412. Schell claims that Mr. McCormack's "psychiatric maladies" he was treated for at Charter are likewise not compensable because they were caused by the civil trial. We first note that *Tibbs* was decided prior to substantial amendments to Missouri's Workers' Compensation laws in 1993, and a portion of *Tibbs* was subsequently called into question by our supreme court as being superceded by

statute. *See Kasl v. Bristol Care, Inc.*, 984 S.W.2d 852, 853, 855 app. (Mo. banc 1999) (discussing that cases which allow compensation for an injury of which work was only a "precipitating" or "triggering" cause should no longer be followed). Regardless, we find *Tibbs* distinguishable. In *Tibbs,* unlike in this case, the ALJ "found that a sufficient causal connection of appellant's mental condition with the accident was not shown[, and] [t]he Commission adopted his findings." 691 S.W.2d at 412. Thus, on appeal, the evidence was reviewed in a light most favorable to the finding of no causation. The opposite is true in this case. We must review the evidence in a light most favorable to the majority of the Commission's findings of causation; so Schell's reliance upon *Tibbs* is not helpful.

We have considered Schell's arguments and the evidence properly cited in support. The evidence relied upon by Schell does not tip the scales enough to merit reversal. When asked whether he had an opinion about whether the hospitalization at Charter was reasonable and necessary to treat Mr. McCormack for his work-related injury, Dr. Abrams replied, "I think it was absolutely mandatory, because he was suicidal, paranoid, and extremely disturbed." Likewise, Dr. Wahba testified that he believed, to a reasonable degree of medical certainty, that the Charter hospitalization was reasonably necessary to treat Mr. McCormack's work-related injuries of major depression, seizure disorder, post-traumatic stress disorder, and cognitive dysfunction. Dr. Hughes' disagreement with Dr. Wahba's findings, as relied upon by Schell, were

*Cahall v. Riddle Trucking, Inc.*, 956 S.W.2d 315, 320 (Mo.App. E.D.1997) (explaining that "[t]he only record we review is the record certified by the commission as containing all documents and papers on file in the matter.").

**11.** Rule references are to the Missouri Rules of Civil Procedure (2002).

explicitly found to be "less than credible" by the ALJ. The Commission adopted this finding. Additional evidence showed that Mr. McCormack began suffering from depression not long after the accident. The evidence also supported a finding that the problem escalated because he was not receiving the right treatment, and then, finally, his mental problems escalated to a point requiring hospitalization. Despite Schell's argument to the contrary, Mr. McCormack's complaints of psychological problems for several years without requiring hospitalization do not automatically preclude a finding that the Charter treatment was a result of the electrical shock.

Schell also isolates small portions of Mr. McCormack's testimony in an attempt to show that he, too, acknowledged the treatment was necessitated by the civil trial. However, Mr. McCormack's testimony, which the Commission found credible, contradicts this claim. At one point in the hearing before the ALJ, Schell's counsel specifically asked Mr. McCormack whether he had to go to Charter because of the outcome of his civil case, and Mr. McCormack replied, "No, sir."

Further reference to every piece of evidence presented to relate Mr. McCormack's treatment at Charter to his electrical injury is unnecessary. Schell's arguments go primarily to matters of credibility, on which we defer to the Commission. *Davis,* 903 S.W.2d at 571. Having measured the evidence by the applicable standard of review, this court holds the Commission's finding that Mr. McCormack's treatment at Charter Hospital was causally related to his work injury, and that, therefore, Schell is responsible for the additional related medical costs, is supported by competent and substantial evidence on the whole record

and is not against the overwhelming weight of the evidence. *Id.*

Point II is denied.

### Point III: Unreasonable Termination of Benefits Under § 287.140.5

In its third point on appeal, Schell alleges that "[t]he majority of the ... Commission erred in awarding costs because [section] 287.140.5 precludes compensation when claimant unreasonably refused to go to the Mayo Clinic for a thorough and complete evaluation and termination of benefits was not unreasonable."

Section 287.210.1 states in relevant part:

[a]fter an employee has received an injury he shall from time to time thereafter during disability submit to reasonable medical examination at the request of the employer, his insurer, the commission, the division or an administrative law judge, *the time and place of which shall be fixed with due regard to the convenience of the employee and his physical condition and ability to attend.*

(Emphasis added.) This issue stems from Schell's arrangement for Mr. McCormack to be seen at the Mayo Clinic in Rochester, Minnesota, the week beginning on April 1, 1999. As explained by the Commission in its description of the circumstances surrounding the event:

The record reflects that [Mr. McCormack]'s attorney wrote [Schell]'s attorney on several occasions explaining that the trip needed to be rescheduled due to [Mr. McCormack]'s situation which required a traveling companion, as well as arrangements for child care. Strangely, [Mr. McCormack] was also scheduled to see [Schell]'s expert on the day he returned, obviously causing a difficult or impossible time conflict. Because of [Mr. McCormack]'s failure or alleged

"refusal", [Schell] and [its] insurer discontinued benefits.

The Commission found that Mr. McCormack's "refusal" to go to the Mayo Clinic for an evaluation when scheduled "was neither an unreasonable refusal nor any refusal as contemplated by § 287.140.5." In addition, the Commission found that although Schell had not been unreasonable in its defense of *all* issues, "the discontinuation of the temporary total disability benefits [when Mr. McCormack was unable to go to the Mayo Clinic] was clearly unreasonable and arbitrary. Accordingly, [Mr. McCormack was] awarded costs pursuant to § 287.560." As a result, "[i]n weighing the nature of the offensive behavior, and the expenses incurred, [the Commission found Schell and its insurer] should pay the costs of the deposition fees of the medical experts ... in the amount of $5,162.50."

Schell, again urging this court to consider Commissioner Wrigley's opinion to the contrary, argues that the Commission erred in so holding on two inter-related grounds: first, in finding that Mr. McCormack's refusal to go to the Mayo Clinic was not an unreasonable refusal under section 287.140.5,[12] and second, in finding, as a result, that Schell's termination of benefits based upon Mr. McCormack's failure to go to the Mayo Clinic was unreasonable and therefore awarding costs under section 287.560.[13] Schell's argument focuses primarily on the first ground, i.e., it maintains that, *as a matter of law,* Mr. McCormack's refusal to go to the Mayo Clinic was unreasonable under section 287.140.5. Schell maintains that this issue warrants *de novo* review because it involves a finding of ultimate fact reached by application of law. We disagree. The majority of its arguments are matters of factual re-argument and credibility issues. Schell seeks to attack determinations made by the Commission that were "reached [] by a process of natural reasoning from the facts alone" and are, therefore, granted deference. *Davis,* 903 S.W.2d at 571. For example, Mr. McCormack, his wife, his daughter, his father-in-law, and some of Mr. McCormack's neighbors and friends testified. Schell argues there was no explanation as to why one of those persons could not have accompanied Mr. McCormack to the Mayo Clinic, so Mr. McCormack's contentions that he had no traveling companion "[were] simply without merit." Schell also touts the reputation and attributes of the Mayo Clinic and argues that Mr. McCormack's "refusal" to go to the "world-renowned" Mayo Clinic is inconsistent with his desire to get better. With regard to the Commission's finding concerning the "difficult or impossible time conflict," Schell claims that the expert the Commission is referring to was hired in the civil trial and was not Schell's expert. In support of this argument, Schell again cites to another appeal previously before this court and the transcript therein. There is no citation to the record before the Commis-

12. Section 287.140.5 states in relevant part:

No compensation shall be payable for the ... disability of an employee, if and insofar as the ... disability may be caused, continued or aggravated by any unreasonable refusal to submit to any medical or surgical treatment or operation, the risk of which is, in the opinion of the division or the commission, inconsiderable in view of the seriousness of the injury.

13. Section 287.560 states in relevant part, "if the division or the commission determines that any proceedings have been brought, prosecuted or defended without reasonable ground, it may assess the whole cost of the proceedings upon the party who so brought, prosecuted or defended them." *See Stillwell v. Universal Constr. Co.,* 922 S.W.2d 448 (Mo. App. W.D.1996) (relied upon by the Commission in evaluating the issue of costs assessed against Schell).

sion, so these contentions will not be considered.

For each of Schell's factual arguments, evidence to the contrary was before the Commission, and we review the award in a light most favorable to the contrary Commission findings. Pursuant to the standard of review set forth in *Davis,* the Commission's findings that Mr. McCormack did not unreasonably refuse treatment at the Mayo Clinic and that Schell's subsequent termination of benefits was unreasonable, thus warranting an award of costs, are supported by competent and substantial evidence on the whole record and are not against the overwhelming weight of the evidence. *Id.*

Point III is denied.

## Point IV: Permanent and Total Disability

■ In Schell's fourth and final point on appeal, it alleges that a majority of the Commission erred in finding Mr. McCormack to be permanently and totally disabled. Specifically, Schell maintains that the Commission arbitrarily "cast aside unimpeached evidence as the preponderance, if not the overwhelming weight, of the evidence demonstrated that claimant was not permanently and totally disabled as a result of the injury."

Section 287.020.7 states that " **'total disability'** ... shall mean inability to return to any employment and not merely mean inability to return to the employment in which the employee was engaged at the time of the accident." (Emphasis in original.) As this court recently explained:

"[t]he test for permanent total disability is the worker's ability to compete in the open labor market in that it measures the worker's potential for returning to employment. The critical question then becomes whether any employer in the usual course of employment would reasonably be expected to hire this employee in his or her present physical condition."

*Karoutzos v. Treasurer of the State of Missouri,* 55 S.W.3d 493, 499 (Mo.App. W.D.2001) (quoting *Reese v. Gary & Roger Link, Inc.,* 5 S.W.3d 522, 526 (Mo.App. E.D.1999)).

Schell argues Mr. McCormack did not suffer a permanent total disability as a result of the electrical shock. Once again, Schell urges this court to consider Commissioner Wrigley's dissenting opinion as probative. A large part of Schell's argument in Point IV is a re-argument of the causation issues previously discussed in this opinion and will not be revisited. To the extent that the argument differs, we do not feel it is necessary to set forth at length the evidence contrary to the Commission's findings as they are not against the weight of the evidence. Schell cites to the case of *Garibay v. Treasurer of Missouri,* 930 S.W.2d 57, 61 (Mo.App. E.D.1996), as mandating that "competent, substantial and undisputed evidence of an unimpeached witness can not [sic] be arbitrarily cast aside." Although Schell's citation to *Garibay* is correct, a large portion of Schell's argument again lacks citation to the record in violation of Rule 84.04(i), and we perceive no indication that the Commission "arbitrarily cast aside" any evidence. To the contrary, the ALJ's fourteen pages of Findings of Fact and Conclusions of Law, which were largely incorporated into the Commission's award, show that the vast amount of evidence was carefully considered. The primary issues raised by Schell ultimately involve questions of fact, credibility and conflicting medical opinions, on which matters we defer to the Commission. *Davis,* 903 S.W.2d at 571.

Point IV is denied.

## Conclusion

The record contains sufficient competent and substantial evidence to support the Commission's award, and the award is not against the weight of the evidence. Accordingly, we affirm.

ELLIS, P.J., and EDWIN H. SMITH, J., concur.